UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LATRICIA RICHARD, an individual; and LATRICIA RICHARD, as a personal representative of the Estate of Baby Girl Richard,<br><br>    Plaintiffs,<br><br>v.<br><br>UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA; et al.,<br><br>    Defendants. | 2:09-cv-02444-LDG-PAL<br><br>**ORDER** |

Plaintiff Latricia Richard filed this action against University Medical Center of Southern Nevada ("UMC") alleging violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1359dd. UMC has filed a motion for summary judgment (Doc. #15, opposition #22, reply #26, supplement to opposition #27) and a motion to strike Plaintiffs' "supplement" to their Opposition (#28). Plaintiffs have filed a motion to strike any reference to fetal monitoring in UMC's summary judgment motion and reply (#43). The court now addresses these pending motions.

**I. Background**

Plaintiff Latricia Richard arrived at the UMC emergency department late in evening of December 8, 2009. Richard was approximately twenty-two weeks pregnant. She was directed to the labor and delivery department where she complained of pain in her back, sides, and stomach.

At approximately 22:25, the labor and delivery triage nurse conducted an initial screening of Richard's symptoms, vital signs, and relevant history. During this initial assessment, the nurse checked the box corresponding to "Possible Onset of Labor" as the reason for Richard's visit, but no contractions were noted.

At approximately 22:30, Richard was moved to a bed in the labor and delivery department. Richard was then placed on an external fetal monitor. At 22:40, Dr. Turner was notified of Richard's status and ordered catheterization, urinalysis, and administration of Ambien. Richard's urinalysis was negative, and she was discharged at approximately 03:25 the next morning with discharge documents on pre-term labor precautions and instructions to follow up with her own physician later that morning.

Richard followed up with her doctor at approximately 09:30 the next morning. During that exam, her doctor determined that Richard had symptoms of premature labor, and Richard was taken to UMC by ambulance for pre-term delivery. Unfortunately, the premature fetus was not viable and was pronounced dead at 13:26 that afternoon.

**II. Motions to Strike**

Plaintiffs have filed a motion to strike references to fetal heart monitoring in UMC's motion and reply. This court has previously ordered that "[n]either party will be permitted to use the supplemental fetal monitoring records that were not initially produced in the records request made by Plaintiffs' Counsel prior to this case as well as in Defendants' Initial Disclosures as stated in open court." Am. Mins. of Proceedings, Sept. 21, 2010, ECF No. 42; *see also* Order Granting Mot. to Strike 3, Oct. 5, 2010, ECF No. 47. Plaintiffs' motion to strike, however, is overly broad in that it apparently seeks to strike any reference to fetal heart monitoring by UMC. For example, Plaintiffs have specifically moved to strike the following line from UMC's Motion: "She was given a bed and hooked up to a fetal monitor." Pls.' Mot. to Strike 3 (quoting Def.'s Mot. for Summ. J. 9:23-25), Sept. 27, 2010, ECF No. 43. The fact that Richard was "hooked up to a fetal

monitor" is not prohibited by this court's previous order because it is supported by evidence other than the medical records specifically excluded. Plaintiffs' own Opposition states that "Richard was placed on an external fetal monitor." Pls.' Opp'n 4, ECF No. 22. The court will accordingly grant Plaintiffs' Motion only insofar as it seeks to strike references to, or conclusions about, fetal heart monitoring based solely on evidence prohibited by this court's previous order.

UMC has filed a motion to strike Plaintiffs' "supplement" to their Opposition. In their "supplement," Plaintiffs argue that "Defendants are dead wrong that [sic] when they state that 'Plaintiffs did not dispute in their Opposition that Plaintiff Richard was admitted to Labor and Delivery'" and that UMC's reply inappropriately references fetal heart tracings not previously produced in discovery. The court is not impressed with Plaintiffs' apparent attempt to bolster their Opposition and present new arguments that Richard was not "admitted." Even assuming Plaintiffs had filed this "supplement" after properly moving for leave to file a surreply, Plaintiffs' arguments far exceed the proper scope of such a filing and implicitly acknowledge the deficiency of their Opposition. Furthermore, as referenced above, the fetal heart monitoring issue is now moot. Therefore, the court will grant UMC's motion to strike.

### III. Motion for Summary Judgment

A grant of summary judgment is appropriate only where the moving party has demonstrated through "the pleadings, the discovery and disclosure materials on file, and any affidavits" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (a), (c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). All justifiable inferences must be viewed in the light most favorable to the non-moving party. *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts

1  demonstrating there is a genuine issue for trial. *Id.* The party opposing summary judgment "must
2  cite to the record in support of the allegations made in the pleadings to demonstrate that a genuine
3  controversy requiring adjudication by a trier of fact exists." *Taybron v. City & Cnty. of S.F.*, 341
4  F.3d 957, 960 (9th Cir. 2003). If the non-moving party meets its burden, summary judgment must
5  be denied. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

6  Plaintiffs claim that UMC violated the EMTALA screening and stabilization requirements.
7  Under EMTALA, "[i]f an individual seeks emergency care from a hospital with an emergency
8  room and if that hospital participates in the Medicare program, then 'the hospital must provide for
9  an appropriate medical screening examination within the capability of the hospital's emergency
10 department . . . to determine whether or not an emergency medical condition . . . exists." *Bryant v.*
11 *Adventist Health System/West*, 289 F.3d 1162, 1165 (9th Cir. 2002) (quoting 42 U.S.C. §
12 1395dd(a)). Although EMTALA does not define "appropriate medical screening," the Ninth
13 Circuit has held that a hospital satisfies EMTALA's "appropriate medical screening" requirement
14 "if it provides a patient with an examination comparable to the one offered to other patients
15 presenting similar symptoms, unless the examination is so cursory that it is not 'designed to
16 identify acute and severe symptoms that alert the physician of the need for immediate medical
17 attention to prevent serious bodily injury.'" *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1256 (9th
18 Cir. 2001) (quoting *Eberhardt v. City of L.A.*, 62 F.3d 1253, 1257 (9th Cir. 1995)).

19 "If the hospital's medical staff determines that there is an emergency medical condition,
20 then, except under certain circumstances not relevant here, the staff must 'stabilize' the patient
21 before transferring or discharging the patient." *Bryant*, 289 F.3d at 1165 (citing 42 U.S.C. §
22 1395dd(b)(1); *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 992 (9th Cir. 2001)). An "emergency
23 medical condition" generally means "a medical condition manifesting itself by acute symptoms of
24 sufficient severity (including severe pain) such that the absence of immediate medical attention
25 could reasonably be expected to result in (i) placing the health of the individual (or, with respect to
26

a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A).  With respect to a pregnant woman who is having contractions, an "emergency medical condition" means "(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child." *Id.* § 1395dd(e)(1)(B).  The term "stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility," or with respect to an "emergency medical condition" applicable to a pregnant woman having contractions, "to deliver (including the placenta)." *Id.* § 1395dd(e)(3)(A).  The term "transfer" includes discharge.  *Id.* § 1395dd(e)(4).

UMC urges this court to enter summary judgment in its favor.  UMC argues that Plaintiffs' failure to screen claims fail as a matter of law because Richard was admitted to the labor and delivery department.  While "EMTALA's stabilization requirement ends when an individual is admitted for inpatient care," *Bryant*, 289 F.3d at 1168, UMC's authorities do not make clear that an "inpatient" admission necessarily satisfies the EMTALA screening requirement, *cf.* 42 C.F.R. § 489.24(d)(2)(i) ("If a hospital has screened an individual . . . and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual.").  Furthermore, the court is not persuaded that the record supports UMC's contention that, as a matter of law, Richard was admitted to the labor and delivery department as an "inpatient," as that term is defined for purposes of this analysis.  *See id.* §§ 489.24(b), 409.10.  Therefore, contrary to UMC's assertions, the court cannot conclude that Richard was admitted as an inpatient as a matter of law.

UMC also argues that Plaintiffs' failure to screen claims fail as a matter of law because Plaintiffs do not allege that Richard's examination differed from those offered to other patients presenting similar symptoms and because Plaintiffs' allegations are insufficient to establish a cursory screening claim. As stated above, a hospital satisfies the EMTALA "appropriate medical screening" requirement if it "provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury." *Jackson*, 246 F.3d at 1256 (citations and internal quotation marks omitted). Plaintiffs have not alleged that Richard's examination differed from that offered to any other patients presenting similar symptoms, nor have they directed the court to any evidence to support such a claim. Therefore, to succeed on their failure to screen claim, Plaintiffs must demonstrate that the examination was "so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury." *Id.*

Plaintiffs' Complaint seems to suggest that Richard received no medical screening at all. *See* Compl. ¶ 69, ECF No. 1 ("Despite the complaints by Richard recorded in the medical record by the UMC nursing staff, there was no indication that any diagnosis or other appropriate medical screening was performed."). While a hospital violates the EMTALA "appropriate medical screening" requirement by failing to provide any medical screening, Richard certainly received some evaluation and testing, and Plaintiffs have failed to direct the court to any argument or authority why Richard's evaluation and testing cannot constitute a medical screening, regardless of whether such a screening constitutes an "appropriate medical screening" under EMTALA. Thus, the court understands Plaintiffs' Complaint to allege that UMC failed to conduct an "appropriate medical screening" because "[n]o physician, certified nurse-midwife, or other qualified medical person acting within his or her scope of practice as defined in hospital medical staff bylaws and

State law, performed a physical gynecological or obstetrical examination on Richard" or "certified that . . . Richard was in false labor before she was discharged . . . ." *Id.* ¶¶ 68-70. As discussed below, however, the false labor certification requirement is relevant only to Plaintiffs' failure to treat claims. Furthermore, "negligence in the screening process or the provision of a merely faulty screening, as opposed to refusing to screen or disparate screening, does not violate EMTALA, although it may implicate state malpractice law." *Hoffman v. Tonnemacher*, 425 F. Supp. 2d 1120, 1131 (E.D. Cal. 2006). Thus, Plaintiffs' allegation that UMC failed to screen because it failed to provide a physical gynecological or obstetrical examination is only relevant insofar as they demonstrate a triable issue of fact that such a "physical gynecological or obstetrical examination" is necessary for an "appropriate medical screening" of a patient presenting with Richard's symptoms.

Plaintiffs' Opposition does not present any argument or evidence specifically addressing their failure to screen claims. In fact, their Opposition simply argues that "the presumption of being in labor is given to pregnant women," "Defendants have not demonstrated, pursuant to the regulatory standard applicable to this case, that Plaintiff was not in labor when she presented to UMC on December 8, 2009," and, therefore, "Defendants' Motion must fail, at the very least, as there is a genuine issue of material fact." Pls.' Opp'n 3, 9. Based on these premises, Plaintiffs conclude that "Plaintiff's EMTALA claims are valid, as Defendants failed to stabilize Plaintiff prior to releasing her." *Id.* at 9. The court, however, fails to see how these arguments support Plaintiffs' failure to screen claims. The presumption of "true labor" only applies to pregnant women who are "experiencing contractions." *See* 42 C.F.R. § 489.24(b). Similarly, the definition of an "emergency medical condition" under 42 U.S.C. § 1395(e)(1)(B), upon which Plaintiffs' Opposition exclusively relies, applies only to a "pregnant woman who is having contractions." Thus, the relevant question for Plaintiffs' failure to treat claims is not "whether Ms. Richard was in labor," Pls.' Opp'n 7, but whether she was "experiencing" or "having contractions," whether

7

UMC determined she was experiencing an "emergency medical condition" applicable to women experiencing contractions, and whether UMC took appropriate steps to "stabilize" any such condition, *see* 42 U.S.C. § 1395(b), (e)(1)(B); 42 C.F.R. § 489.24(b). In any event, however, Plaintiffs present no evidence upon which a reasonable jury could conclude that the examination Richard received was "so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury." *Jackson*, 246 F.3d at 1256 (citations and internal quotation marks omitted). A labor and delivery nurse took Richard's vital signs, medical history, and symptoms. The nurse noted that Richard was not experiencing any contractions. Richard was placed on a bed, and an external fetal heart monitor was applied. Then, pursuant to a physician's orders, Richard received a catheter and a urinalysis was conducted. Richard was then discharged after a negative urinalysis result, instructed to follow up with her own doctor that morning, and provided instructions to return to the labor and delivery department if she experienced any of a list of labor symptoms. If a physical gynecological or obstetrical examination was also necessary to constitute an "appropriate medical screening," as Plaintiffs' Complaint seems to suggest, Plaintiffs have failed to present any evidence or testimony upon which a reasonable jury could base such a conclusion. The mere suggestion that a hospital could have conducted additional testing does not alone support the conclusion that the examination Richard received was not an "appropriate medical screening" under EMTALA. *See, e.g.*, *Zinn v. Valley View Hosp.*, No. CIV-09-425-FHS, 2010 WL 301860, at *4 (E.D. Okla. Jan. 19, 2010) ("This argument, however, says nothing about Valley View's procedures for evaluating patients in Dawn Zinn's condition, but rather, it merely suggests that what was done was inadequate, and that if further evaluation had been performed, the tragic death of Plaintiffs' baby would not have occurred . . . . Whether further screening could have been performed, or whether the requested fetal monitor should have been delivered to the emergency room and applied to Dawn Zinn, are issues to be addressed in the context of state malpractice

law." ). To hold otherwise, the court must assume that a plaintiff has raised a genuine issue of material fact regarding an "appropriate medical screening" whenever any additional procedures, treatments, or examinations were possible. The court rejects this assumption, however, because without any evidence to suggest that a specific examination or procedure is necessary to conduct an "appropriate medical screening" under the circumstances, a jury is simply left to speculate about the medical utility of a particular procedure to "identify acute and severe symptoms" that a plaintiff may or may not have exhibited. *See, e.g.*, *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 884 (4th Cir. 1992) ("Moreover, Mr. Baber is not a doctor and is not qualified to evaluate whether Dr. Kline's actions constitute a medical screening examination . . . Therefore, Mr. Baber's allegation that Dr. Kline did not perform any screening, without more, does not meet his burden of production on a summary judgment motion."). Thus, this issue, even if material, cannot be genuine in the absence of any evidence upon which a reasonable jury could base its decision. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992) (citing *Anderson*, 477 U.S. 242, 247-48 (1986)). Furthermore, the fact that Richard's private physician later discovered a "bulging bag of water" and a dilated cervix when he performed a physical obstetric examination does not alone support the conclusion that a "physical gynecological or obstetrical examination" was necessary for Plaintiffs' labor and delivery examination to constitute an "appropriate medical screening" under EMTALA. "[A] hospital does not violate EMTALA if it fails to detect or if it misdiagnoses an emergency condition," and "[a]n individual who receives substandard medical care may pursue medical malpractice remedies under state law." *Bryant*, 289 F.3d at 1166. The critical issue, upon which Plaintiffs present no evidence or testimony, is whether a physical gynecological or obstetrical examination was medically necessary for Plaintiffs' examination to constitute an "appropriate medical screening" under the relevant statutory provisions. Therefore, summary judgment is appropriate on Plaintiffs' failure to screen claims because Plaintiffs have failed to raise a genuine issue of material fact that the exam was "so cursory that it is not designed

to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury." *Jackson*, 246 F.3d at 1256 (citations and internal quotation marks omitted).

UMC argues that summary judgment is also appropriate on Plaintiffs' failure to treat claims because Plaintiffs have not produced any evidence that UMC determined that an "emergency medical condition" existed or that UMC failed to "stabilize" any such condition. As noted above, Plaintiffs' Opposition suggests that it is UMC's burden to demonstrate that Richard was not in labor, and, because UMC never provided the proper false labor certification, UMC failed to "stabilize" because it did not deliver Richard's fetus and placenta. The applicable statutory and regulatory language, however, do not support Plaintiffs' reasoning.

As Plaintiffs' Opposition suggests, EMTALA, "with respect to this case," defines "emergency medical condition" as:

> (B) with respect to a pregnant woman who is having contractions-
> (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
> (ii) that transfer may pose a threat to the death or safety of the woman or unborn child.

Pls.' Opp'n 7 (quoting 42 U.S.C. § 1395dd(e)(1)(B)). If a hospital determines that a woman has an "emergency medical condition" as just defined above, then that hospital has the duty to "stabilize" the woman, which means "to deliver (including the placenta)." 42 U.S.C. § 1395dd(e)(3)(A). A hospital's duty to "stabilize" does not arise until it first determines that an "emergency medical condition" exists. *See Jackson*, 246 F.3d at 1255 (citing *Eberhardt*, 62 F.3d at 1259). Thus, UMC maintains that summary judgment is appropriate because UMC never determined that Richard had an "emergency medical condition." Plaintiffs argue, however, that UMC's Motion must fail because UMC has "failed to demonstrate, pursuant to the regulatory standard applicable in case, that Plaintiff was not in labor when she presented to UMC on

December 8, 2009." Pls.' Opp'n 9.  In support of this position, Plaintiffs cite the definition of "labor" in the EMTALA regulations:

> Labor means the process of childbirth beginning with the latent or early phase of labor and continuing through the delivery of the placenta. A woman experiencing contractions is in true labor unless a physician, certified nurse-midwife, or other qualified medical person acting within his or her scope of practice as defined in hospital medical staff bylaws and State law, certifies that, after a reasonable time of observation, the woman is in false labor.

42 C.F.R. § 489.24(b).  The court notes, however, that this definition is inapposite to Plaintiffs' claims.  The terms "labor" or "true labor" are not used in the operative language of any subsection relevant to Plaintiffs' claims.  Although the term "labor" appears in the EMTALA provisions regarding the transfer of an unstabilized patient to another facility, *see* 42 U.S.C. § 1395dd(c); 42 C.F.R. § 489.24(b), neither Plaintiffs' Complaint nor Plaintiffs' Opposition cite to, or make claims under, these provisions.  More fundamentally, though, Plaintiffs' argument misses the mark.  The essential issues relevant to Plaintiffs' failure to "stabilize" claims are whether UMC determined that an "emergency medical condition" existed, and then, only if it made such a determination, what steps it took to "stabilize" that condition.  Plaintiffs incorrectly attempt to excuse their own lack of evidence by suggesting that the "true labor" presumption shifts that burden to UMC.  In this regard, Plaintiffs also mistakenly assume that the "true labor" presumption necessarily establishes an "emergency medical condition" under EMTALA.  It does not.  In any event, however, this argument fails for the same reason that Plaintiffs have failed to demonstrate that UMC determined that Richard exhibited an "emergency medical condition."  The presumption of "true labor" only applies to pregnant women who are "experiencing contractions."  *See* 42 C.F.R. § 489.24(b).  Similarly, the definition of an "emergency medical condition" under 42 U.S.C. § 1395(e)(1)(B), upon which Plaintiffs' Opposition exclusively relies and which Plaintiffs apparently concede governs their claims, applies only to a "pregnant woman who is having contractions."  Plaintiffs have failed to allege or offer any evidence that Richard was "experiencing" or "having contractions."  The only reference to contractions in the entire record is in the labor and delivery

11

nurse's notes at 22:30, where the nurse indicated that Richard was not experiencing contractions. As noted above, the party opposing summary judgment must go beyond the pleadings and "cite to the record in support of the allegations made in the pleadings to demonstrate that a genuine controversy requiring adjudication by a trier of fact exists." *Taybron*, 341 F.3d at 960. Because Plaintiffs have failed to cite to any evidence that Richard was experiencing contractions, even in affidavit form, the court must, in any case, reject the inapplicable "true labor" presumption upon which Plaintiffs exclusively rely. Furthermore, because Plaintiffs have not introduced any evidence that Richard was experiencing a threshold symptom for the "emergency medical condition" Plaintiffs claim Richard exhibited, in the absence of any other evidence, a reasonable jury could not conclude that UMC determined that Richard had an "emergency medical condition." *See Eberhardt*, 62 F.3d at 1259; *see also Baber*, 977 F.2d at 884 ("Because Mr. Baber failed to present any evidence that RGH knew she had an emergency medical condition at the time of her transfer to BARH, we need not inquire further into whether she was stabilized prior to her transfer."). Therefore, summary judgment is appropriate because Plaintiffs have failed to raise a triable issue of fact that UMC failed to "stabilize" an "emergency medical condition" after it determined that Richard exhibited such a condition.

## IV. Conclusion

Accordingly,

THE COURT HEREBY ORDERS that Plaintiffs' motion to strike (#43) is GRANTED only as to references to, or conclusions about, fetal heart monitoring based solely on evidence prohibited by this court's previous order.

THE COURT FURTHER ORDERS that UMC's motion to strike (#28) is GRANTED.

THE COURT FURTHER ORDERS that UMC's motion for summary judgment (#15) is GRANTED.

////

12

1  Dated this ___ day of March, 2011.

_____
Lloyd D. George
United States District Judge